UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **HORACE HUNT,** | ) | **COMPLAINT AND DEMAND** |
| | ) | **FOR JURY TRIAL** |
|     Plaintiff | ) | |
| | ) | |
| v. | ) | CASE NO. |
| | ) | |
| **AUXILIUM PHARMACEUTICALS, INC.,** | ) | |
| | ) | |
|     Defendant. | ) | |

## COMPLAINT

COMES NOW, Plaintiff, Horace Hunt, by and through his undersigned counsel, and for his causes of action, hereby sues Defendant, Auxilium Pharmaceuticals, Inc., and alleges as follows:

## INTRODUCTION

1. This case involves the prescription drug Testim®, which is manufactured, sold, distributed and promoted by Defendant Auxilium Pharmaceuticals, Inc. as a testosterone replacement therapy.

2. Defendant misrepresented that Testim is a safe and effective treatment for hypogonadism or "low testosterone," when in fact this drug causes serious medical problems, including life-threatening cardiac events, strokes, and thrombolytic events.

3. Defendant engaged in aggressive, award-winning, direct-to-consumer and physician marketing and advertising campaigns for Testim. Further, Defendant engaged in an aggressive unbranded "disease awareness" campaign to alert men that they might be suffering from low testosterone.

4. As a result, diagnoses of low testosterone have increased exponentially. This has

1

directly related to Testim's sales increasing to over $209 million per year.

5. However, consumers of Testim were misled as to the drug's safety and efficacy, and as a result have suffered injuries including life-threatening cardiac events, strokes and thrombolytic events.

## PARTIES

6. Plaintiff Horace Hunt (hereinafter "Plaintiff") is, and was at all times relevant hereto, a resident and citizen of Fairless Hills, Pennsylvania. At the time Horace was injured by his use of Testim, he resided in Fairless Hills, Pennsylvania.

7. Defendant Auxilium Pharmaceuticals, Inc. (hereinafter "Auxilium" or "Defendant") is a Delaware corporation which has its principal place of business at 640 Lee Road, Chesterbrook, Pennsylvania 19087. Auxilium has conducted business and derived substantial revenue throughout the United States.

8. At all times relevant to this Complaint, Defendant was engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, the prescription testosterone drug sold under the name Testim, throughout the United States.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant and because the amount in controversy between Plaintiff and Defendants exceeds $75,000, exclusive of interest and cost, and because, among other reasons, Defendant has significant contacts with this district by virtue of doing business within this judicial district.

10. Venue is proper within this district pursuant to 28 U.S.C. § 1391 because Defendant resides in this district and because a substantial part of the acts and/or omissions giving rise to these

claims occurred within this district.

## GENERAL ALLEGATIONS

11. This action is brought on behalf of Plaintiff who was prescribed, supplied with, and who has taken and applied the prescription drug Testim, as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed, sold or otherwise placed in the stream of interstate commerce by Defendant. This action seeks, among other relief, general and special damages and equitable relief in order to enable Plaintiff to treat and monitor the dangerous, severe and life-threatening side effects caused by Testim.

12. Defendant's wrongful acts, omissions, and fraudulent misrepresentations caused Plaintiff's injuries and damages.

13. At all times herein mentioned, Defendant was engaged in the business of research, licensing, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging and/or advertising for sale or selling the prescription drug Testim for the use and application by Plaintiff.

14. At all times herein mentioned, Defendant was authorized to do business within the state of residence of Plaintiff.

15. At all times herein mentioned, Defendant's officers and directors participated in, authorized, and directed the production and promotion of the aforementioned product when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of said product and thereby actively participated in the tortious conduct which resulted in the injuries suffered by Plaintiff herein.

16. Plaintiff files this lawsuit within the applicable limitations period of first suspecting that said drugs caused the appreciable harm sustained by Plaintiff. Plaintiff could not, by the

exercise of reasonable diligence, have discovered the wrongful case of Plaintiff's injuries at an earlier time because the injuries were caused without perceptible trauma or harm, and when Plaintiff's injuries were discovered their cause was unknown to Plaintiff. Plaintiff did not suspect, nor did Plaintiff have reason to suspect, that Plaintiff had been injured, the cause of the injuries, or the tortious nature of the conduct causing the injuries, until less than the applicable limitations period prior to the filing of this action. Additionally, Plaintiff was prevented from discovering this information sooner because Defendant herein misrepresented and continues to misrepresent to the public and to the medical profession that their testosterone drugs are safe and free from serious side effects, and Defendant has fraudulently concealed facts and information that could have led Plaintiff to discover a potential cause of action.

## **OVERVIEW**

17. Hypogonadism is a specific condition of the sex glands, which may involve the diminished production or nonproduction of testosterone for men.

18. A study published in the Journal of the American Medical Association ("JAMA") in August 2013 entitled "Trends in Androgen Prescribing in the United States, 2001-2011" indicated that many men who get testosterone prescriptions have no evidence of hypogonadism. For example, one third of men prescribed testosterone had a diagnosis of fatigue, and one quarter of men did not even have their testosterone levels tested before they received a testosterone prescription.

19. Defendant coordinated massive advertising campaigns designed to convince men that they suffered from low testosterone. Defendant orchestrated national disease awareness media blitzes that purported to educate male consumers about the signs of low testosterone. The marketing campaigns included promotional literature placed in healthcare providers' offices and distributed to potential testosterone users, and online media.

20. The advertisements suggest that various symptoms often associated with other conditions may be caused by low testosterone and encourage men to discuss testosterone replacement therapy with their doctors if they experienced any of the "symptoms" of low testosterone. These "symptoms" include listlessness, increased body fat, and moodiness—all general symptoms that are often a result of aging, weight gain, or lifestyle, rather than low testosterone.

21. Defendant also sought to convince primary care physicians that low testosterone levels are widely under-diagnosed, and that conditions associated with normal aging could be caused by low testosterone levels.

22. While running disease awareness campaigns, Defendant promotes their product, Testim, as an easy to use topical testosterone replacement therapies. Defendant contrasts their products' at-home topical application with less convenient prescription testosterone injections, which require frequent doctor visits.

23. Defendant convinced millions of men to discuss testosterone replacement therapy with their doctors, and consumers and their physicians relied on Defendant's promises of safety and ease. Although prescription testosterone replacement therapy had been available for years, millions of men who had never been prescribed testosterone flocked to their doctors and pharmacies.

24. What consumers received, however, were not safe drugs, but products which cause life-threatening problems, including blood clots, strokes, and heart attacks.

25. Sales of testosterone replacement therapies have more than doubled since 2006, and are expected to triple to $5 billion by 2017, according to forecasts by Global Industry Analysts. Shannon Pettypiece, Are Testosterone Drugs the Next Viagra? May 10, 2012, Bloomberg Businessweek, available at:

http://www.businessweek.com/articles/2012-05-10/ are testosterone-drugs-the-next-viagra.

26. Defendant's marketing program sought to create the image and belief by consumers and physicians that low testosterone affected a large number of men in the United States and that the use of testosterone is safe for human use, even though Defendant knew these to be false, and even though Defendant had no reasonable grounds to believe them to be true.

27. There have been a number of studies concluding that testosterone therapy causes a sudden increase in hematocrit, hemoglobin and estradiol, and associating its use with increased the risk of blood clots, heart attacks, and strokes.

28. In 2010, a New England Journal of Medicine Study entitled "Adverse Events Associated with Testosterone Administration" was discontinued after an exceedingly high number of men in the testosterone group suffered adverse events.

29. In November of 2013, a JAMA study was released entitled "Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels" which indicated that testosterone therapy raised the risk of death, heart attack and stroke by about 30%.

30. On January 29, 2014, a study was released in PLOS ONE entitled "Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men" which indicated that testosterone use doubled the risk of heart attacks in men over 65 years old and men younger than 65 with a previous diagnosis of heart disease.

**FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

31. The Food and Drug Administration approved Testim on October 31, 2002 for the treatment of adult males who have low or no testosterone. After FDA approval, Testim was widely advertised and marketed by Defendant as a safe and effective testosterone replacement therapy.

32. Testim is a hydroalcoholic gel containing testosterone. Testim is applied to the shoulders and upper arms. Testim enters the body through transdermal absorption.

33. Testosterone is a primary androgenic hormone responsible for normal growth, development of the male sex organs, and maintenance of secondary sex characteristics.

34. The hormone plays a role in sperm production, fat distribution, maintenance of muscle strength and mass, and sex drive.

35. In men, testosterone levels normally begin a gradual decline after the age of 30.

36. The average testosterone levels for most men range from 300 to 1,000 nanograms per deciliter of blood. However, testosterone levels can fluctuate greatly depending on many factors, including sleep, time of day, and medication. Resultantly, many men who fall into the hypogonadal range one day will have normal testosterone levels the next.

37. Testim may produce undesirable side effects to patients who use the drugs, including but not limited to, myocardial infarction, stroke, and death.

38. In some patient populations, Testim use may increase the incidence of myocardial infarctions and death by over 500%.

39. In addition to the above, Testim has been linked to several severe and life-changing medical disorders in both users and those who come into physical contact with users or the unwashed clothes of someone who applied testosterone. Patients taking testosterone may experience enlarged prostates and increased serum prostate-specific antigen levels.

40. Secondary exposure to testosterone can cause side effects in others. In 2009 the FDA issued a black box warning for testosterone prescriptions, advising patients of reported virilization in children who were secondarily exposed to the gel. Testosterone may also cause physical changes in women exposed to the drug and cause fetal damage with pregnant women who come into secondary contact with testosterone.

41. Defendant's marketing strategy beginning in 2000 has been to aggressively market and sell their products by misleading potential users about the prevalence and symptoms of low

testosterone and by failing to protect users from serious dangers that Defendant knew or should have known to result from use of its products.

42. Defendant successfully marketed testosterone by undertaking "disease awareness" marketing campaigns. These campaigns sought to create a consumer perception that low testosterone is prevalent among U.S. men and that symptoms previously associated with other physical and mental conditions, such as aging, stress, depression, and lethargy were actually attributable to low testosterone.

43. Defendant's advertising programs sought to create the image and belief by consumers and their physicians that the use of testosterone was a safe method of alleviating their symptoms, had few side effects and would not interfere with their daily lives, even though Defendant knew or should have known these to be false, and even though Defendant had no reasonable grounds to believe them to be true.

44. Defendant purposefully downplayed, understated and outright ignored the health hazards and risks associated with using testosterone. Defendant deceived potential testosterone users by relaying positive information through the press, including testimonials from retired professional athletes, and manipulating hypogonadism statistics to suggest widespread disease prevalence, while downplaying known adverse and serious health effects.

45. In particular, in the warnings Defendant gives in their commercials, online and print advertisements, Defendant fails to mention any potential cardiac or stroke side effects and falsely represents that Defendant adequately tested testosterone for all likely side effects. Defendant concealed material relevant information from potential testosterone users and minimized user and prescriber concern regarding the safety of testosterone.

46. As a result of Defendant's advertising and marketing, and representations about their products, men in the United States pervasively seek out prescriptions for testosterone. If Plaintiff

8

in this action had known the risks and dangers associated with testosterone, Plaintiff would not have taken testosterone and consequently would not have been subject to its serious side effects.

## SPECIFIC FACTUAL ALLEGATIONS

47. Plaintiff Horace Hunt was 56 years old when he was prescribed and used Testim as directed for symptoms he attributed to low testosterone as a result of Defendant's advertisements.

48. After taking multiple doses of Testim, on or about September 13, 2013, Plaintiff suffered a myocardial infarction.

49. Testim consumed by Plaintiff caused physical and emotional impairment which affected his personal and professional life. As a result of the myocardial infarction, Plaintiff a triple bypass surgery.

50. Prior to using Testim, Plaintiff had no history of blood clots, strokes, or heart attacks.

51. Plaintiff has incurred significant medical expenses as a result of the treatment he underwent due to taking Testim. Plaintiff will continue to incur future medical expenses as his injury is permanent, lost wages as a result of being unable to work, his ability to labor and earn money has been impaired, he is at increased risk for future health problems and disability, and he suffered physical pain and mental anguish.

52. Had Defendant properly disclosed the risks associated with Testim, Plaintiff would have avoided the risk of myocardial infarctions by either not using testosterone at all, severely limiting the dosage and length of use, and/or by closely monitoring the degree to which the drugs were adversely affecting his health.

## FIRST CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY
## DEFECT DUE TO INADEQUATE WARNING

53. Plaintiff adopts by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and

set forth at length herein.

54. Defendant is liable under the theory of product liability as set forth in §§ 402A and 402B of the Restatement of Torts 2d.

55. The Testim manufactured and/or supplied by Defendant was defective due to inadequate warnings or instructions because after Defendant knew or should have known of the risk of serious bodily harm from the use of Testim, Defendant failed to provide an adequate warning to consumers and/or their health care providers of such risks, knowing Testim could cause serious injury.

56. Defendant failed to adequately warn consumers and/or their health care providers that Testim could cause increased hematocrit levels that could cause heart attacks, strokes, pulmonary cardiovascular events, aneurysms and blood clots.

57. Defendant failed to adequately warn consumers and/or their health care providers that while a patient was taking Testim it was necessary to frequently monitor hematocrit levels to prevent heart attacks, strokes, pulmonary embolisms, cardiovascular events, aneurysms and blood clots.

58. The Testim manufactured and/or supplied by Defendant was defective due to inadequate post-marketing warnings or instructions because, after Defendant knew or should have known of the risk of serious bodily harm from the use of Testim, Defendant failed to provide an adequate warning to consumers and/or their health care providers of the product, knowing the product could cause serious injury.

59. As a direct and proximate result of Plaintiff's reasonably anticipated use of Testim as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by Defendant, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

## **SECOND CAUSE OF ACTION**
## **NEGLIGENCE**

60. Plaintiff adopts by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

61. At all times herein mentioned, Defendant had a duty to properly manufacture, design, formulate, compound, test, produce, process, assemble, inspect, research, distribute, market, label, package, distribute, prepare for use, sell, prescribe and adequately warn of the risks and dangers of Testim.

62. At all times herein mentioned, Defendant negligently and carelessly manufactured, designed, formulated, distributed, compounded, produced, processed, assembled, inspected, distributed, marketed, labeled, packaged, prepared for use and sold Testim and failed to adequately test and warn of the risks and dangers of Testim.

63. Despite the fact that Defendant knew or should have known that Testim caused unreasonable, dangerous side effects, Defendant continued to market Testim to consumers including Plaintiff, when there were safer alternative methods and/or no need to treat conditions such as loss of energy, libido erectile dysfunction, depression, loss of muscle mass and other conditions that Testim marketing materials claim are caused by low testosterone.

64. Defendant knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care as described above.

65. Defendant's negligence was a proximate cause of the Plaintiff's injuries, harm and economic loss which Plaintiff suffered, and will continue to suffer, as described and prayed for herein.

11

**THIRD CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY**

66. Plaintiff adopts by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

67. Prior to the time that the aforementioned products were used by Plaintiff, Defendant impliedly warranted to Plaintiff and Plaintiff's agents and physicians that Testim was of merchantable quality and safe and fit for the use for which it was intended.

68. Plaintiff was and is unskilled in the research, design and manufacture of medical drugs, including Testim, and reasonably relied entirely on the skill, judgment and implied warranty of Defendant in using Testim.

69. Testim was neither safe for its intended use nor of merchantable quality, as warranted by Defendant, in that Testim has dangerous propensities when used as intended and will cause severe injuries to users.

70. As a result of the abovementioned breach of implied warranties by Defendant, Plaintiff suffered injuries and damages as alleged herein.

**FOURTH CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY**

71. Plaintiff adopts by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

72. At all times mentioned, Defendant expressly represented and warranted to Plaintiff and Plaintiff's agents and physicians, by and through statements made by Defendant or their authorized agents or sales representatives, orally and in publications, package inserts and other written materials intended for physicians, medical patients and the general public, that Testim is

safe, effective, fit and proper for its intended use. Plaintiff purchased Testim relying upon these warranties.

73. In utilizing Testim, Plaintiff relied on the skill, judgment, representations, and foregoing express warranties of Defendant. These warranties and representations were false in that Testim is unsafe and unfit for its intended uses.

74. As a result of the abovementioned breach of express warranties by Defendant, Plaintiff suffered injuries and damages as alleged herein.

## FIFTH CAUSE OF ACTION
## FRAUD

75. Plaintiff adopts by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

76. Defendant, from the time they first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed Testim, and up to the present, willfully deceived Plaintiff by concealing from them, Plaintiff's physicians and the general public, the true facts concerning Testim, which Defendant had a duty to disclose.

77. At all times herein mentioned, Defendant conducted a sales and marketing campaign to promote the sale of Testim and willfully deceive Plaintiff, Plaintiff's physicians and the general public as to the benefits, health risks and consequences of using Testim. Defendant knew of the foregoing, that Testim is not safe, fit and effective for human consumption, that using Testim is hazardous to health, and that Testim has a serious propensity to cause serious injuries to its users, including but not limited to the injuries Plaintiff suffered.

78. Defendant concealed and suppressed the true facts concerning Testim with the intent to defraud Plaintiff, in that Defendant knew that Plaintiff physicians would not prescribe Testim,

and Plaintiff would not have used Testim, if they were aware of the true facts concerning its dangers.

79. As a result of Defendant's fraudulent and deceitful conduct, Plaintiff suffered injuries and damages as alleged herein.

## SIXTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

80. Plaintiff adopts by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

81. From the time Testim was first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, Defendant made misrepresentations to Plaintiff, Plaintiff's physicians and the general public, including but not limited to the misrepresentation that Testim was safe, fit and effective for human consumption. At all times mentioned, Defendant conducted a sales and marketing campaign to promote the sale of Testim and willfully deceive Plaintiff, Plaintiff's physicians and the general public as to the health risks and consequences of the use of the abovementioned product.

82. The Defendant made the foregoing representation without any reasonable ground for believing them to be true. These representations were made directly by Defendant, by sales representatives and other authorized agents of Defendant, and in publications and other written materials directed to physicians, medical patients and the public, with the intention of inducing reliance and the prescription, purchase and use of the subject product.

83. The representations by Defendant were in fact false, in that Testim is not safe, fit and effective for human consumption, using Testim is hazardous to health, and Testim has a serious propensity to cause serious injuries to users, including but not limited to the injuries suffered by Plaintiff.

14

84. The foregoing representations by Defendant, and each of them, were made with the intention of inducing reliance and the prescription, purchase and use of Testim.

85. In reliance of the misrepresentations by Defendant, and each of them, Plaintiff was induced to purchase and use Testim. If Plaintiff had known of the true facts and the facts concealed by Defendant, Plaintiff would not have used Testim. The reliance of Plaintiff upon Defendant's misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

86. As a result of the foregoing negligent misrepresentations by Defendant, Plaintiff suffered injuries and damages as alleged herein.

## **PUNITIVE DAMAGES ALLEGATIONS**

87. Plaintiff adopts by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

88. The acts, conduct, and omissions of Defendant, as alleged throughout this Complaint were willful and malicious. Defendant committed these acts with a conscious disregard for the rights of Plaintiff and other Testim users and for the primary purpose of increasing Defendant's profits from the sale and distribution of Testim. Defendant's outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Defendant in an amount appropriate to punish and make an example of Defendant.

89. Prior to the manufacturing, sale, and distribution of Testim, Defendants knew that said medication was in a defective condition as previously described herein and knew that those who were prescribed the medication would experience and did experience severe physical, mental, and emotional injuries. Further, Defendant, through its officers, directors, managers, and agents, knew that the medication presented a substantial and unreasonable risk of harm to the public,

including Plaintiff and as such, Defendant unreasonably subjected consumers of said drugs to risk of injury or death from using Testim.

90. Despite its knowledge, Defendant, acting through its officers, directors and managing agents for the purpose of enhancing Defendant's profits, knowingly and deliberately failed to remedy the known defects in Testim and failed to warn the public, including Plaintiff, of the extreme risk of injury occasioned by said defects inherent in Testim. Defendant and its agents, officers, and directors intentionally proceeded with the manufacturing, sale, and distribution and marketing of Testim knowing these actions would expose persons to serious danger in order to advance Defendant's pecuniary interest and monetary profits.

91. Defendant's conduct constitutes gross negligence and demonstrates a reckless disregard for the lives, safety and health of others, entitling the Plaintiff to an award of punitive damages pursuant to Civil Code section 3294.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant, as follows, as appropriate to each cause of action alleged and as appropriate to the particular standing of Plaintiff:

A.  General damages in an amount that will conform to proof at time of trial;

B.  Special damages in an amount within the jurisdiction of this Court and according to proof at the time of trial;

C.  Loss of earnings and impaired earning capacity according to proof at the time of trial;

D.  Medical expenses, past and future, according to proof at the time of trial;

E.  For past and future mental and emotional distress, according to proof;

F.  For punitive or exemplary damages according to proof;

G.  Restitution, disgorgement of profits, and other equitable relief;

    H.      Injunctive relief;

    I.      Attorney's fees;

    J.      For costs of suit incurred herein;

    K.      For pre-judgment interest as provided by law; and

    L.      For such other and further relief as the Court may deem just and proper.

### **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all claims so triable in this action.


Dated: September 8, 2014                Respectfully submitted,


                                              /s/Robert M. Foote

                                          Robert M. Foote (3124325)
                                          Kathleen C. Chavez
                                          Matthew J. Herman

                                          **FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC**
                                          10 West State Street
                                          Suite #200
                                          Geneva, Illinois 60134
                                          Telephone: 630-232-7450
                                          Facsimile: 630-232-7452
                                          rmf@fmcolaw.com
                                          kcc@fmcolaw.com
                                          mjh@fmcolaw.com


                                          Dennis G. Pantazis
                                          Joshua D. Wilson
                                          D.G. Pantazis, Jr.
                                          Patrick L. Pantazis

                                          **WIGGINS CHILDS PANTAZIS FISHER GOLDFARB**
                                          The Kress Building
                                          301 Nineteenth Street North
                                          Birmingham, AL 35203
                                          Telephone: 205-314-0531
                                          Facsimile: 205-314-0731

Case: 1:14-cv-06940 Document #: 1 Filed: 09/08/14 Page 18 of 18 PageID #:18

dgp@wigginschilds.com

***ATTORNEYS FOR PLAINTIFF***